THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
AMY TAYLOR *et al.*, Defendants-Appellees.

Third District  Nos. 3—92—0487, 3—92—0488 cons.

Opinion filed June 3, 1993.

Larry VanDerSnick, State's Attorney, of Cambridge (John X. Breslin and Lawrence Michael Kaschak, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Joseph N. Ehmann, of State Appellate Defender's Office, of Ottawa, for appellees.

JUSTICE STOUDER delivered the opinion of the court:

The defendants, David Londergon and Amy Taylor, were each charged by information with unlawful possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(a)(11)), unlawful possession of a controlled substance (Ill. Rev. Stat. 1991, ch. 56½, par. 1402(a)(11)), and unlawful possession of cannabis (Ill. Rev. Stat. 1991, ch. 56½, par. 704(a)). In a consolidated proceeding, the defendants successfully moved to suppress the drug evidence as the product of an illegal search and seizure. The People appeal. We affirm.

Amy Taylor and David Londergon each filed motions to suppress drug evidence seized in the search of the car they were traveling in on February 17, 1992. In addition, Londergon filed motions to quash his arrest and suppress certain statements he is alleged to have made. The People filed a motion to dismiss Taylor's motion to suppress on the grounds she did not have standing to challenge the stop or the search. A hearing on the motions was held on June 3, 1992.

At the hearing, Londergon testified he was a resident of Telluride, Colorado. On the afternoon of February 17, 1992, he and Taylor were traveling west on Interstate 80 in Henry County in his 1967 Volvo wagon. The Volvo carried Colorado license plates. Londergon and Taylor were returning to Colorado after visiting his parents in Joliet. Londergon testified that at the time he had waist-length hair and a beard.

At around mile marker 11, they were stopped by an Illinois State trooper. The trooper approached the car and stated, "no problem kids." The trooper told them he noticed the car did not have a rear bumper. He asked Londergon to come back to his car so he could issue a warning ticket. In the trooper's car, Londergon offered the trooper his Colorado driver's license and insurance card. The trooper wrote out the warning ticket and Londergon signed it.

According to Londergon, as he was preparing to exit the trooper's car, the trooper stated he was with "the Illinois Drug Enforce-

ment Agency." He asked Londergon if he could conduct a routine search of Londergon's car. The trooper assured Londergon that he was not "a likely candidate," but they "needed negative searches also." Londergon testified, "In my exact words I told the officer that I had a long drive ahead of me. I would just as soon be on my way." In response, the trooper stated it would only take a minute and he called on his radio for a backup.

After requesting the backup, the trooper exited the car and told Londergon to remain near the trooper's vehicle. Londergon testified that the period of time between the trooper's search request and the trooper's exit from the patrol car was approximately 30 seconds. Londergon testified the trooper began searching the Volvo. A second trooper arrived about five minutes later. Subsequently, a third State trooper pulled up.

Londergon testified he never told the trooper he could search his car. He denied saying he had no objection to a search. He also conceded he did not directly tell the trooper he could not conduct the search. Londergon testified that while in the trooper's car he was not offered a written search consent form. He subsequently refused to sign a statement which in part said he consented to the search.

Londergon further testified that while in custody at the Henry County jail, he wrote and signed a written statement claiming ownership of the drugs found in his car. Londergon testified he did this in the presence of the trooper who made the initial stop. He testified the trooper told him if he did not make such a statement his girlfriend—Taylor—would not be released. In rebuttal, Londergon testified he was mistaken about the identity of the trooper he made the statement to at the jail. He actually made the written statement to the third trooper, a woman officer.

Amy Taylor testified she was seated in the front passenger seat of Londergon's car at the time they were stopped. She and Londergon were on their way back to Colorado. Her personal effects and luggage were in the car. Her luggage was in the area behind the front seats along with Londergon's things. (Being a wagon, there was no trunk *per se*.)

Taylor testified that after they were stopped, the trooper approached their car and told them there was no problem; however, it was a law in Illinois that a car had to have a bumper. The trooper asked Londergon to step back to the trooper's vehicle so he could issue a written warning. Eventually, the trooper returned to the passenger side of the Volvo and asked her to step out of the car. At

the time, he was the only trooper present. The trooper did not ask her if he could search the car. Nor did he ask if any of the items in the car were hers.

Taylor walked back to where Londergon was standing near the trooper's car. According to Taylor, the trooper began searching the Volvo. About 5 to 10 minutes later, a second male trooper pulled up.

Illinois State Trooper Joel Peters testified he stopped the Volvo because it did not have a rear bumper. He asked Londergon to step back to his car so he could issue a warning ticket. After issuing the ticket, Peters testified he told Londergon he was with the State Police Drug Interdiction Team and with Londergon's permission he wanted to search the Volvo for weapons, drugs and open alcohol. Peters testified it was a routine request made to "most people" he stopped, and that the team focused on interstate traffic.

Although he could not remember Londergon's exact words, Peters testified Londergon gave consent to the search of the Volvo. Because it was policy not to search a vehicle without assistance, Peters called Trooper Gerald Stahr. When Stahr arrived he got into the back of Peters' vehicle. Peters, in Stahr's presence, again asked Londergon for permission to conduct a search. Londergon gave oral permission.

Peters testified he went to the Volvo and opened the driver's side door. Taylor was still seated in the front passenger seat. He immediately smelled the odor of burnt cannabis. With Taylor still in the car, Peters looked between the front passenger seats. Under a rag he found a small black tin can with a twist top. Peters opened the can. On looking inside, Peters saw what looked like marijuana seeds. He noted a strong smell of burnt cannabis. According to Peters, he went back to Trooper Stahr and told him what he had found. He indicated there was probably more and they would have to perform a further search. On a further search of the items in the back of the Volvo, the officers found a small marijuana pipe, a small amount of marijuana, and two large ziplock bags containing what appeared to be psilocybin mushrooms. After these things were found in the Volvo, Londergon and Taylor were placed under arrest and transported to the Henry County jail.

On cross-examination, Peters reiterated that he stopped the Volvo because it did not have a rear bumper. He stated he did not notice the driver prior to stopping the car. He denied using a suspect profile to determine which cars to stop and search. Peters agreed the search of Londergon's car was based solely on the con-

sent of the driver. He conceded he did not ask Londergon to sign a written consent even though he had copies of the form in his car. Peters denied he commenced the search of the Volvo prior to Stahr's arrival. He further testified that Stahr arrived almost immediately after he asked Londergon for permission to search. He confirmed he conducted the initial search while Taylor was still seated in the car, even though members of the team are instructed to remove all passengers before conducting a search. He explained the weather was cold and windy that day.

Trooper Gerald Stahr testified he was called to the scene by Peters to serve as backup. He stated it took him three or four minutes to get there after he received the call from Peters. After getting into the back seat of Peters' car, he heard Londergon give permission for a search, although he could not remember Londergon's exact words.

Peters then went and searched the front seat area of the Volvo and returned with a small dark container which contained a substance suspected of being cannabis. Peters indicated they would need to do a further search. Peters returned to the Volvo. Stahr testified that after Trooper Anna Segura arrived, he got out of Peters' car and assisted Peters in the search. Stahr also testified to standing near Taylor outside the Volvo. He could not remember whether this was before or after Segura arrived.

Trooper Anna Segura testified that as she pulled up, Taylor was being brought back from Londergon's car. In her report, Segura stated that Peters removed Taylor and Londergon from the Volvo in order to conduct the search. Segura testified this was based on what Peters told her. She and Stahr were talking at a crossover prior to his going to the scene. She could not recall his being called by Peters. Instead, she thought he had left to do a "drive by." Segura further testified she obtained the written statement from Londergon concerning ownership of the drugs found in the car.

Following the hearing, the trial court entered an order denying the People's motion to dismiss Taylor's motion to suppress, and granting the defendants' suppression motions.

Initially, it must be borne in mind that we are dealing with a search based solely on the alleged consent of David Londergon. There is no assertion the search was premised on any of the grounds included in the so-called "automobile exception to the warrant requirement." See *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (officers have probable cause to search; however, it is not practicable to secure a warrant because

the vehicle can be quickly moved out of the jurisdiction in which the warrant must be sought); *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (search incident to a valid arrest); *Harris v. United States* (1968), 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992 (plain view doctrine).

On appeal, the People assert the trial court committed reversible error in imposing a heightened standard of proof on the State. The People maintain the trial court found the People had failed to carry their burden of showing consent to the search by Londergon by clear and convincing evidence. The People state that they have the burden of showing by a preponderance of the evidence that the consent was voluntarily given. See *People v. Casazza* (1991), 144 Ill. 2d 414, 581 N.E.2d 651.

However, here we are presented, as was the trial court, with the question of whether Londergon consented to the search, not with whether his alleged consent was voluntary. Substantive fourth amendment law requires that a consent be unequivocal and specific, as well as voluntary. (*People v. Cardenas* (1992), 237 Ill. App. 3d 584, 604 N.E.2d 953.) The trial court's ruling on a motion to suppress will not be disturbed on review unless that ruling is manifestly erroneous. *People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.

In this case, Londergon testified that in response to Peters' request to conduct a search, he told Peters he had a long drive ahead of him and he would just as soon be on his way. Peters then stated it would only take a minute, he called for a backup, and then went to the Volvo and began conducting a search.

Peters confirmed Londergon's statements as to having a long drive ahead of him. Additionally, however, he maintained that Londergon gave oral permission to conduct the search. On the other hand, Peters could not remember the exact words Londergon used in giving that permission. Peters admitted to having had written consent forms with him, though he never offered one to Londergon for his signature. The trial court also noted the discrepancies in the troopers' descriptions of events that day. For example, when the search was commenced, who was present and whether Taylor was seated in the Volvo during the search.

■ The trial court found the troopers' testimony concerning the alleged consent by Londergon was not credible. On review of the record, we cannot say this finding was manifestly erroneous. Even judged under a preponderance of the evidence standard, Londergon's statement to Trooper Peters was not an unequivocal and

specific consent to search the Volvo. Given there were no other grounds upon which to justify the search, Londergon suffered a violation of his rights under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) to be free from an unreasonable search and seizure by government authorities. Thus, the trial court correctly granted his motion to suppress the evidence seized and his subsequent statements.

■■ Regarding the standard utilized by the trial court, we note on reviewing the report of the proceedings that in closing argument, the prosecutor did not disagree with defense counsel's assertion that the consent had to be shown by clear and convincing evidence. In fact, the prosecutor opened his argument referring to what clear and convincing evidence required. Later he stated the People had met their burden by clear and convincing evidence. We find it rather disingenuous to argue a point of law before the trial court, and then on appeal contend that position is the basis for a reversal. We find the People's argument before the trial court resulted in a forfeiture of this contention.

On appeal, the People also contend the trial court erred in denying their motion to dismiss Taylor's motion to suppress, and granting Taylor's motion, because she had no "standing" to challenge the search, even if the search was unconstitutional *vis-a-vis* Londergon. The People argue Taylor asserted no possessory interest in the car or the items searched. Therefore, she cannot claim a violation of her rights under the fourth amendment.

The fourth amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

The fourth amendment protects people, not places. (*Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507.) In order to effectuate the protections of the fourth amendment, the United States Supreme Court has limited the use of evidence obtained in violation of the amendment's requirements. Under the exclusionary rule fashioned in *Weeks v. United States* (1914), 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341, and extended to the States in *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, any evidence seized from a defendant in violation of his or her fourth amendment rights is excluded from that defendant's criminal trial. (*Alderman v. United States* (1969), 394 U.S.

165, 22 L. Ed. 2d 176, 89 S. Ct. 961.) The deterrent values of preventing the incrimination of those whose rights government authorities have violated is considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. *Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961.

However, the Court has also held that the rights assured by the fourth amendment are personal rights and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the unreasonable search and seizure. (See *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) In other words, a person who is aggrieved by an unreasonable search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not suffered any infringement of his fourth amendment rights. (*Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961.) Since the exclusionary rule is an attempt to effectuate the guarantees of the fourth amendment, it is proper to permit only defendants whose fourth amendment rights have been violated to benefit from the rule's protections. *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.

In *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, the Supreme Court stated that the proper question was whether the challenged search or seizure violated the fourth amendment rights of the criminal defendant who seeks to exclude the evidence obtained during the search. This in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the fourth amendment was designed to protect. The analysis hinges on substantive fourth amendment doctrine, not on principles of standing. Thus, the question in the instant case is not whether Amy Taylor had "standing" to raise a fourth amendment claim, but rather whether the search and seizure violated her rights under the fourth amendment, therefore requiring suppression of the evidence illegally obtained. Under the circumstances, we find the search violated Taylor's fourth amendment rights and that the trial court correctly granted her motion to suppress.

In *Rakas*, the defendants were convicted of the armed robbery of a clothing store in Bourbonnais, Illinois. The defendants were passengers in an automobile stopped shortly after the robbery. A search of the automobile turned up a sawed-off rifle under the front

passenger seat and rifle shells in a locked glove compartment. Prior to trial, the defendants had unsuccessfully moved to suppress the sawed-off rifle and rifle shells found in the search. This court affirmed the trial court's denial of the defendants' motion to suppress, and the Illinois Supreme Court denied the defendants' petition for leave to appeal.

On appeal to the United States Supreme Court, the Court rejected the "legitimately on the premises" standard announced in *Jones v. United States* (1960), 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725. The Court viewed "legitimately on the premises" as creating "too broad a gauge for measurement of fourth amendment rights." (*Rakas v. Illinois* (1978), 439 U.S. 128, 142, 58 L. Ed. 2d 387, 400, 99 S. Ct. 421, 429.) Rather, the capacity to claim the protections of the fourth amendment depends on whether the person who claims those protections has "a legitimate expectation of privacy in the invaded place." (*Rakas v. Illinois* (1978), 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430.) A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. See *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (Harlan, J., concurring).

The *Rakas* Court stated that a person can have a legally sufficient interest in a place other than one's own home so that the fourth amendment provides protection from unreasonable governmental intrusion into that place. (See also *Minnesota v. Olson* (1990), 495 U.S. 91, 109 L. Ed. 2d 85, 110 S. Ct. 1684.) Determination of whether a person has such an interest is not governed or limited by reference to real and personal property law. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.) The *Rakas* Court noted it had previously pointed out that cars "are not to be treated identically with houses or apartments for Fourth Amendment purposes." *Rakas v. Illinois* (1978), 439 U.S. 128, 148, 58 L. Ed. 2d 387, 404, 99 S. Ct. 421, 433.

In the case before it, the *Rakas* Court found the defendants had asserted no property or possessory interest in the vehicle searched or the items seized. Nor did they make a showing that they had any legitimate expectation of privacy in the glove compartment or the area under the seats. The Court stated that "[l]ike the trunk of an automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy." (*Rakas v. Illinois* (1978), 439 U.S. 128, 148-49, 58 L. Ed. 2d 387, 404, 99 S. Ct. 421, 433.) Nevertheless, in a final footnote the majority specifically rejects the dissent's contention that the major-

ity is holding that a passenger in an automobile could not invoke a fourth amendment claim unless he happens to own or have a possessory interest in the automobile. (*Rakas v. Illinois* (1978), 439 U.S. 128, 149 n.17, 58 L. Ed. 2d 387, 405 n.17, 99 S. Ct. 421, 433 n.17.) In the footnote, the majority notes the defendants did not claim a legitimate expectation of privacy in the areas searched, only that they were legitimately on the premises. They further reiterated the defendants' status as simple passengers.

■ Therefore, we read the *Rakas* majority as holding circumstances exist under which a passenger in a vehicle may have a legitimate expectation of privacy in certain areas of that vehicle. (*Cf. Bates v. Maryland* (1985), 64 Md. App. 279, 284, 494 A.2d 976, 978-79 ("*Rakas* by no means held that a passenger in an automobile for a three-week cross-country trip, with his luggage in the trunk, might not have a reasonable expectation of privacy in that trunk \*\*\*").) We find the case before us to be just such a case. Here, Taylor was traveling with Londergon on a long-distance trip from Joliet, Illinois, to Telluride, Colorado. Their trip had originated in Colorado. The record shows Londergon and Taylor were in a relationship. She testified her personal effects and luggage were in the car. Her luggage was in the back portion of the Volvo along with Londergon's. The interior of the Volvo was in a sense their "home" for the duration of this trip. Common sense tells us that during the duration of this trip, Taylor would treat the interior of the Volvo as her own—sleeping, eating and moving about as she chose. She might move her belongings (and Londergon's) about as needed and store or place them where convenient.

In sum, under these circumstances Taylor was not just a passenger in Londergon's car. Her interest in the interior of the car was more than that of a mere passenger. In this context, we easily recognize that Taylor would have an expectation of privacy to the extent afforded to the interior of an automobile. (For example, one would not have an expectation of privacy in items left in plain view.) She had a legitimate expectation of privacy society is prepared to recognize as reasonable. Any of us traveling for an extended period of time in a car, in which we stored our belongings, would expect a certain amount of privacy over the duration of that trip. Thus, in this case, the search and seizure, if unreasonable, violated Taylor's rights under the fourth amendment.

In the instant case, Trooper Peters did not ask for Taylor's consent to conduct the search. As found above, the People failed to prove Londergon consented to the search. Peters did not have a

search warrant. He conceded at the hearing he lacked probable cause to search the Volvo. No arrest had taken place prior to the search, and nothing incriminating lay in plain view. Under these circumstances, the search was unreasonable, Peters violated Taylor's rights under the fourth amendment, and the trial court correctly granted Taylor's motion to suppress.

For the forgoing reasons, the judgment of the circuit court of Henry County is affirmed.

Affirmed.

McCUSKEY, P.J., and LYTTON, J., concur.